IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

XO COMMUNICATIONS SERVICES, INC.                    PLAINTIFF

VS.                        CASE NO. 05-3018

SOUTHERN TELECOM, INC.                              DEFENDANT

## MEMORANDUM OPINION

Plaintiff, XO Communications Services, Inc. ("XO"), brings this action against Southern Telecom, Inc. ("Southern Telecom"), asserting a breach of contract claim.  The matter is before the Court for decision following a two-day trial to the Court beginning on January 5, 2006.  The following will constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## BACKGROUND

1.   XO is a telecommunications provider headquartered in Reston, Virginia.  Southern Telecom is a smaller scale provider located in Mountain Home, Arkansas.

2.   On November 12, 2003, the parties executed a document entitled "XO Communications Master Service Order Agreement Terms and Conditions" ("Master Agreement") (Pl.'s Ex. 20), whereby XO agreed to provide Southern Telecom Integrated Service Digital Network Primary Rate Interface ("ISDN-PRI") services.  ISDN-PRI is a digital access technology that allows for simultaneous,

integrated voice and data capabilities over standard existing phone lines.

Under the agreement between XO and Southern Telecom, Southern Telecom would send phone calls from its customers to XO, and XO would provide the services that, in turn, would route the calls to a telephone switch that belonged to a local telecommunications exchange carrier for their final delivery to the end customer. XO would carry the calls over its own facilities for much of the route, but then pass the calls off to a local exchange carrier to terminate the calls to the end customer or recipient of the call. The local exchange carrier imposes a termination charge for all of the calls that it terminates in this matter. For long-distance calls, these charges are referred to as access charges and the rate for terminating these calls is determined by a state or federal tariff. The termination charges for local calls are determined by an interconnection agreement between XO and the local exchange carrier.

3.    The Master Agreement executed by XO and Southern Telecom provided:

> SERVICE OFFERING ... This Agreement consists of signed Service Order Agreements ("SOAs"), valid Access Service Requests ("ASRs")..., including the following terms and conditions, the Product Ts and Cs ... and the general Service terms and conditions (collectively, the "Additional Terms"), both set forth at (www.terms.xo.com) (collectively, and as applicable, the "Terms and Conditions"), and applicable tariffs (collectively, the "Agreement")....

RATES ... Rates do not includes taxes, surcharges and fees charged by XO, including but not limited to ... Long Distance Access Charges....

COMPLETE AGREEMENT/ADDITIONAL TERMS. This Agreement, incorporating all the items referenced herein, represents the complete agreement of the parties, and supersedes all other agreements whether written or oral. This Agreement may be modified only by written agreement executed by authorized parties, changes to the URL sites referenced, changes to tariffs or as otherwise specifically provided herein. This Agreement shall be governed by the substantive law of the Commonwealth of Virginia ....

THE ADDITIONAL TERMS ... MAY BE MODIFIED FROM TIME TO TIME AT XO'S DISCRETION OR AS REQUIRED BY APPLICABLE LAW. YOU AGREE TO REVIEW SUCH CHANGED ITEMS FROM TIME TO TIME AND BE BOUND BY SUCH CHANGES, AS THEY PERTAIN TO THE PARTICULAR SERVICES YOU CHOOSE NOW OR MAY CHOOSE IN THE FUTURE.... YOU HEREBY CONSENT TO THE INCORPORATION OF APPLICABLE TARRIFFS AND THE ADDITIONAL TERMS ... POSTED AT (www.terms.xo.com) .... THE OFFERING AND PROVISIONING OF SERVICES IS SUBJECT TO ANY REQUIRED XO APPROVALS .... IF YOU USE THE SERVICES, YOU ARE DEEMED TO HAVE ACCEPTED THE TERMS AND CONDITIONS ....

(Pl.'s Ex. 20 ¶ ¶ A, C, P.)

4. The online terms incorporated into the Master Agreement

provided:

The Customer will be responsible for all charges incurred, including charges associated with the Customer's use of Services that may be owed to other carriers, including but not limited to any access charges the Company may incur as a result of Customer's actions.

Customer shall promptly pay to XO all access charges ... billed to XO by a third party, or remitted by XO to a third party, that are associated with any of Customer's traffic delivered or facilities utilized pursuant to this Agreement ....

Customer expressly agrees, represents and warrants that it will not use the Services to originate or terminate voice calls in a manner that bypasses switched access ... charges. Customer's breach of any of the Restrictions

constitutes a material default of this Agreement.  XO
reserves the right to terminate this Agreement and/or the
Services provided hereunder for cause immediately upon
written notice to Customer if XO determines in its sole
discretion that Customer is using or plans to use the
Services in a manner inconsistent with any of the
Restrictions....  Customer further agrees ...  to
indemnify, defend and hold harmless XO ... against all
claims, demands, actions, causes of actions, damages,
liabilities, losses and expenses ... incurred as a result
of Customer's breach of this covenant....

If an entity other than the Company (e.g. another carrier
or supplier) imposes charges on the Company associated
with the provision of Services to the Customer, these
charges will be passed onto the Customer.

(Pl.'s Ex. 1 ¶ ¶ 2.4.4; 6.3; 6.5; 7.7.3.)

5.    After executing the Master Agreement, XO and Southern

Telecom executed various "Service Order Agreement[s]" and "Move-

Add-Change-Disconnect Agreement[s]," which set the pricing, or

"monthly recurring charges," for the various markets in which

Southern Telecom utilized XO's services.  (Pl.'s Exs. 7 - 17.)  The

terms of the Service Order Agreements, which were incorporated into

the Move-Add-Change-Disconnect Agreements, mirrored the terms of

the Master Agreement and further provided:

CUSTOMER'S  CERTIFICATION  REGARDING  LOCAL  TRAFFIC.
Customer represents and warrants that all traffic being
delivered by Customer or its designated agent to XO for
local termination, and all traffic that XO delivers to
Customer or its designated agent that has originated in
the same local calling area .. and/or in which such
traffic is terminated to Customer or its designated
agent, is local traffic....  Customer represents and
warrants that Customer has paid all applicable access
charges associated with any non-local traffic.   In
addition, the parties mutually agree that Customer is
exclusively responsible for paying any switched access
charges levied, charged or imposed by any third party

Local Exchange Carrier ("LEC") in connection with the origination or termination of any such non-local traffic.... Customer agrees that, if another carrier ... determines it is necessary to audit the traffic which is delivered pursuant to this Agreement, Customer will cooperate in any such investigation. In addition, to the extent any third party attempts to recover intercarrier compensation from XO as a result of such audit/investigation, Customer agrees that it will indemnify XO for any and all costs resulting from such third party actions.

(Pl.'s Exs. 7 & 17 ¶ M.)

6.    XO provided services to Southern Telecom under the above agreements and terms until February 2005, when XO was sued by one of its local exchange carriers for access charges.  The local exchange carrier alleged that XO had used its facilities to terminate long-distance calls, rather than purely local calls, in violation of the parties' interconnection agreement.  XO conducted an investigation and discovered that the long-distance traffic was originating from Southern Telecom.  XO thereafter sent Southern Telecom a letter notifying Southern Telecom that it intended to suspend its services because Southern Telecom had improperly used the services to terminate long-distance calls.  XO ceased providing services to Southern Telecom on March 31, 2005.

7.    In the instant action, XO seeks to recover $625,653.00 in damages for access charges it had to pay to two of its local exchange carriers for the long-distance traffic it alleges originated from Southern Telecom.

XO also seeks to recover $182,322.14 for monthly recurring charges which it alleges Southern Telecom never paid.

**Access Charges**

8.    The services provided by XO to Southern Telecom were governed by the Master Agreement[1], the online terms set out on XO's website[2], the Service Order Agreements, and the Move-Add-Change-Disconnect Agreements.  The Service Order Agreements specifically provided that all traffic Southern Telecom routed through XO would be local traffic.  Further, the Service Order Agreements, Master Agreement, and online terms all provided that Southern Telecom would be responsible for any access charges associated with non-local traffic.

---

[1]Southern Telecom attempted to dispute the application of the Master Agreement by way of a November 12, 2003 e-mail sent to Fred Roberts, the President of Southern Telecom, from Butch Aggen, an XO Carrier Account Manager.  In this e-mail, Aggen stated:

> As we discussed, this sales order agreement is only temporary so that you can be placed in our system and process orders.  Within 30-60 days the actual agreement that applies to [Southern Telecom] will be sent to you for execution.  The terms and conditions included on your orders will supercede this temporary agreement, pending execution of the actual agreement (30-60 days).

(Def.'s Ex. 31.)  At trial, Roberts acknowledged that he refused to sign the agreement that was offered to him as a replacement of the Master Agreement. Thus, the Master Agreement remained in effect and its terms govern the parties' dealings.

[2]The on-line terms reflected in Plaintiff's Exhibit 1 include amendments made in October 2004.  Thus, the on-line terms introduced into evidence were not the exact terms that were in effect in November 2003, when the parties executed the Master Agreement.  The amended terms are nevertheless applicable, as the Master Agreement specifically provided that the on-line terms could be modified at XO's discretion and that Southern Telecom agreed to review and be bound by any changes in the on-line terms.

9.    At trial, Southern Telecom took the position that XO was supposed to "block" all long-distance calls and that, as XO failed to do so, XO is responsible for the resulting access charges and not Southern Telecom.  Fred Roberts, the President of Southern Telecom, testified that the traffic at issue was its customers' (Transcom's and Unipoint's) traffic and that Southern Telecom did not know where the traffic originated from and could not control it.

Bryan Burns, of XO's data fraud section, testified that XO could not block long-distance calls that originated outside its market.  According to Burns, the ability to block the calls was an option within Southern Telecom's network and Southern Telecom could have prevented the long-distance calls from being routed through XO's facilities by simply advising its customers to route them through other facilities.

The Court credits Burns' testimony and concludes that XO was not responsible for blocking the long-distance calls and for the access charges resulting from these calls.

10.    Southern Telecom also took the position at trial that XO was aware Southern Telecom would be terminating long-distance traffic through XO's facilities.  According to Roberts, he was informed during the negotiation process that Southern Telecom would be exempt from the access charges because XO had approved it as an

enhanced service provider (ESP).[3]  Kyle Pentecost, a former XO

sales manager who was involved in negotiating the agreements with

Southern Telecom, corroborated Roberts' testimony in this regard.

XO's witnesses denied that Southern Telecom was approved as an

ESP.

Southern Telecom's position that XO was aware of the long-

distance traffic and exempted Southern Telecom from access charges

appears to be inconsistent with Southern Telecom's other position,

noted above, that XO was supposed to block the long-distance

traffic.  In any event, any representations made to Southern

Telecom during the negotiation process are irrelevant, as the

Master Agreement specifically provided that it superseded all other

agreements of the parties, whether written or oral.

11.  Roberts acknowledged at trial that the terms of the

parties' agreements provided that Southern Telecom would be liable

for access charges, but Roberts maintained that FCC regulations

---

[3]An ESP "offers data processing services that use the
telephone network to transmit information among customers and
computers."  See MCI Telecommunications Corp. v. FCC, 57 F.3d
1136, 1138 (D.C. Cir. 1995).  Familiar examples of enhanced
services include "'[d]atabase services, in which a customer
dials a number to obtain access to stored information, such as
... Lexis ....'" Id. (internal citation omitted).  The Federal
Communication Commission (FCC) has declined to treat providers
of enhanced or information services as common telecommunications
carriers and, in order to promote growth in the field, has
exempted ESP's from access charges.  See Petition for
Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony
Servs. Are Exempt from Access Charges, 2004 WL 856557, *2, 19
F.C.C.R. 7457 (2004).

exempting ESP's from access charges "overruled" the terms of the agreements.  The Court sees no merit to this position because, as acknowledged by Southern Telecom in its post-trial brief, there is no definitive FCC ruling or regulation on the issue of whether telecommunications carriers such as Southern Telecom qualify as an ESP.  The terms of the parties agreements therefore govern the payment of access charges and it is unnecessary for the Court to express any opinion on the issue of whether Southern Telecom qualifies as an ESP.

12.  As the Court has repeatedly pointed out, the terms of the parties agreements specifically provided that Southern Telecom would be responsible for long-distance access charges.  The agreements also provided that Southern Telecom would indemnify XO for any charges it had to pay another carrier in association with XO's provision of services to Southern Telecom.  It is undisputed that XO had to pay two of its local exchange carriers for access charges originating from Southern Telecom's long-distance traffic. Under the terms of the parties agreements, XO is entitled to recoup these charges from Southern Telecom.

13.  With regard to the amount of the charges XO seeks to recover, Gary Case, XO's Director of Carrier Management, testified that he calculated the charges using the rates that the local exchange carriers charged XO.  According to Case, these rates did not include XO's standard mark-up for long-distance services and

the rates were therefore lower than what Southern Telecom would have been charged had it actually purchased long-distance services from XO.

Case explained that he reviewed Southern Telecom's traffic records for the period from February 15, 2005, through March 15, 2005, in extreme detail. Case then multiplied the access charges for this one month times the seven month period (September 2004 through March 31, 2005) for which XO sought to recover and these figures totaled $625,653.00.

Case explained that it would have been impossible to review the traffic records and calculate the data for the entire seven month period, as it would have involved reviewing millions of minutes of traffic. Further, prior to February 2005, XO did not have the software in place to "capture the CPN [calling party number]" and trace the traffic to Southern Telecom. According to Case, the one month period for which he computed the access charges was representative of the other six months, as once Southern Telecom began using XO's services, XO's volume of traffic increased a certain percentage and the volume was consistent throughout the seven month period at issue.

The Court finds that XO has proved the $625,653.00 in damages it seeks to recover for access charges with reasonable certainty and that XO is therefore entitled to recover this entire amount. See Gwaltney v. Reed, 84 S.E.2d 501, 502 (Va. 1954) (a plaintiff is

not required to prove damages with "mathematic precision," but must prove the elements of his damage with reasonable certainty; in other words, a plaintiff must "furnish evidence of sufficient facts or circumstances to permit at least an intelligent and probable estimate thereof").

## Monthly Recurring Charges

14. The Service Order Agreements and Move-Add-Change Disconnect Agreements set monthly recurring charges ("MRC's") Southern Telecom was obligated to pay for the different markets in which it utilized XO's services. XO seeks to recover $182,322.14 for MRC's which it alleges Southern Telecom never paid.

15. Both XO and Southern Telecom submitted spreadsheets calculating the MRC's (Pl.'s Exs. 18, 19). Rather than owing any balance to XO, Southern Telecom's spreadsheet reflects that it actually overpaid XO. The primary discrepancy between the parties' spreadsheets are figures Southern Telecom labeled as "disputed amount[s]" and subtracted from the invoiced amounts. As pointed out by XO, however, the invoiced amounts already reflected credits for the disputed amounts, and thus, the calculations in Southern Telecom's spreadsheet are flawed because they actually reflect a double deduction of the disputed amounts.

16. Another discrepancy between the parties' spreadsheets are the MRC's charged for the "DS1 and DS3" facilities for the "Houston 1" circuit. According to Kathy Robins, Southern Telecom's Vice

President of Operations, XO had agreed to waive these charges. Southern Telecom produced no documentation supporting Robins' testimony. To the contrary, the only exhibit offered reflected that XO had not waived these charges. In a July 26, 2004 e-mail, Shannon Nalazek, the XO representative assigned to handle Southern Telecom's billing disputes, explained to Kathy Robins:

> According to the information we have XO has charged [Southern Telecom] for the DS3 and DS1 because [Southern Telecom] opted not to be a "Take or Pay" customer. If[] [Southern Telecom] had opted to sign a "Take or Pay" agreement with a 25K minimum monthly commitment, then the DS3 and DS1 charges would have been waived. I know there was confusion regarding this initially. (Pl.'s Ex. 21.)

The Court concludes that XO did not agree to waive the charges for the Houston 1 facility and XO is therefore entitled to recover these unpaid charges.

17. Southern Telecom also took issue with the MRC's for the "Southfield" circuit. According to Robins, XO should not have been charged for this circuit because there was never any traffic on it. XO pointed out that the circuit was operational, even if Southern Telecom did not pass any traffic on it. There is nothing in the parties' agreements conditioning Southern Telecom's payment of the MRC's on whether it passed traffic on the circuit. Absent this, the Court finds that the MRC's for the Southfield circuit are valid charges.

18. On the spreadsheet prepared by Southern Telecom, it disputes the entire invoiced amount for the month of March 2005.

XO terminated the provision of services to Southern Telecom on March 31, 2005. Craig Fricke, XO's Director of Revenue Operations, acknowledged at trial that the March 2005 invoice billed through April 23, 2005. XO is obviously not entitled to recover any MRC's past March 31, 2005. It is impossible for the Court to discern from XO's spreadsheet what portion of the March 2005 MRC's are actually for April. The Court therefore has no choice but to disallow all of the March 2005 MRC's, which total $35,714.16.

19. Finally, XO's spreadsheet on its MRC damages includes late fees of $21,685.89, which represent a 1.5% monthly penalty on the outstanding MRC's for a nine-month period (from March 31, 2005, to approximately the time of trial). The Master Agreement provides for a 1.5% monthly interest fee on all past-due invoiced amounts. (Pl.'s Ex. 20 ¶ G.) Further, XO's on-line terms provide that even if a customer disputes an invoiced amount, it must nevertheless pay 80% of the amount while XO investigates the dispute and, if XO determines that the charges are legitimate, the unpaid disputed amount is subject to a late fee. (Pl.'s Ex. 1 ¶ 10.1.) Based on the provisions in the Master Agreement and the on-line terms, the Court finds that the late fees are proper.

## Conclusion

20. Based on the foregoing, a separate judgment will entered awarding XO:

* $625,653.00 in damages for access charges; and

\*      $146,607.98 in damages for unpaid MRC's, which figure reflects a deduction of $35,714.16 for the March 2005 invoice from the $182,322.14 in MRC's claimed.

IT IS SO ORDERED this 1st day of May 2006.


                                    /S/JIMM LARRY HENDREN
                                    JIMM LARRY HENDREN
                                    UNITED STATES DISTRICT JUDGE